UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSE GARCIA

Index No.  08-CIV-1270

Plaintiff,

V.

(SCR)

CITY OF MOUNT VERNON, CITY OF
MOUNT VERNON POLICE DEPARTMENT
AND INDIVIDUALS OF THE CITY OF MOUNT
VERNON POLICE DEPARTMENT,

Defendant.

---

MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR DISMISSAL BASED ON THE PLEADINGS OR ALTERNATIVELY
SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................... i-vi

PRELIMINARY STATEMENT............................................... 1

**POINT I**

THE LEGAL STANDARDS...................................................... 2
    A.    The Instant Motion.............................................. 2
    B.    Motion Pursuant to Fed. R. 12(c)............................. 3
    C.    Motion Pursuant to Fed. R. 56................................. 4
    D.    Qualified Immunity............................................. 5

**POINT II**

THE DEFENDANTS HAD PROBABLE CAUSE TO ARREST
THE PLAINTIFF................................................................ 7

a.    The plaintiffs fitting the description of one of the alleged
attackers coupled with his flight gave probable cause......... 8

b.    On the scene show up, where the putative victim identified
the Plaintiff as one of his attackers, provided probable cause... 9

c.    Officer's failure to explore Plaintiff's alibi does not negate a
finding of probable cause and does not amount to a violation
of the Plaintiff's rights...................................................... 10

**POINT III**

ARGUABLE PROBABLE CAUSE WILL SUFFICE TO CONFER
QUALIFIED IMMUNITY FOR FALSE ARREST CLAIMS UNDER
BOTH STATE AN FEDERAL LAW......................................... 11

**POINT IV**

THE OFFICERS DID NOT USE EXCESSIVE FORCE WHEN
ARRESTING THE PLAINTIFF – INDEED THE FORCE USED
WAS REASONABLE GIVEN THE CIRCUMSTANCE ................. 13

## POINT V

PLAINTIFF'S MALICIOUS PROSECUTION CLAIM MUST FAIL.............................................................................  14

## POINT VI

PLAINTIFF'S DUE PROCESS CLAIMS MUST FAIL.............  15

## POINT VII

PLAINTIFF'S STATE LAW CLAIMS SHOULD FAIL ............  16

CONCLUSION...................................................................  19

TABLE OF AUTHORITIES

*Anderson v. Creighton,*
    483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed2d 523 (1987).....................    **7**

*Anderson v. Liberty Lobby,*
    477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986),...........    **4**

*Davis v. Scherer,*
    468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)......    **7**

*Graham v. Connor,*
    490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443(19  )....................    **13**

*Harlow v. Fitzgerald,*
    457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)......    **7**

*Hunter v. Bryant,*
    502 U.S. 224, 112 S.Ct.534, 60 USLW 3430, 116 L.Ed.2d 589, (1991)....    **7**

*Illinois v. Gates,*
    462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).........…..........    **12**

*Malley v. Briggs,*
    475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)............    **7**

*Mitchell, supra,*
    472 U.S., at 526, 105 S.Ct., at 2815...........................................    **7**

*Pierson v. Ray,*
    386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).......................    **7**

*Saucier v. Katz,*
    533 U.S.194, 121 S.Ct 2151, 150 L.Ed.2d 272 (2001)..........................    **5,6,7**

*Terry v. Ohio,*
    392 U.S.1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)..............................    **7**

*United Mine Workers of America v. Gibbs,*
    383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).....................    **17**

*Bonide Products, Inc. v. Cahill,*
    223 F.3d 141, 145-46 (2d Cir. 2000)………………………………………..    **15**

*Burns Int'l Sec. Serv., Inc. v. Int'l; Union, United Plant Guard Workers of Am.,*
    47 F.3d 14, 16 (2d Cir. 1995)………………………………………....    **3**

*Caldarola v. Calabrese,*
    298 F.3d 156 (2d. Cir. 2002)……………………………………………    **7,11**

*Calamia v. City of New York,*
    879 F.2d 1025, 1035-36 (2d Cir. 1989)………………………………………    **7**

*Carlton -v. Mystic Transp., Inc.,*
    202 F.3d 129, 133 (2d Cir.2000)……………………………………………    **4**

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147, 153 (2d Cir. 2002)…………………………………………    **2**

*Cortec Indus., Inc. v. Sum Holding L.P.,*
    949 F.2d 42, 47 (2d Cir. 1991)……………………………………………    **2**

*Cowan vs. Breen,*
    352 F.3d 756, 761 (2d Cir.2003)……………………………………………    **5,6**

*Curley v. Village of Suffern,*
    268 F.3d 65, 70 (2d Cir.2001)……………………………………………    **11**

*Escalera v. Lunn*
    361 F.3d 737 (2nd Cir. 2004)……………………………………………..    **12**

*Gallo v. Prudential Residential Servs., Ltd. P'ship,*
    22 F.3d 1219, 1223 (2d Cir.1994))…………………………………………..    **4**

*Goenaga v. March of Dimes Birth Defects Found.,*
    51 F.3d 14, 18 (2d Cir.1995)…………………………………………………    **4**

*Goldman v. Belden,*
    754 F.2d 1059, 1065 (2d Cir. 1985)…………………………………………    **2**

*Graham v. Long Island R.R .,*
    230 F.3d 34, 38 (2d Cir.2000). ………………………………………………    **4**

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,*
    32 F.3d 697, 699-700 (2d Cir. 1994)…………………………………    **2**

*Jeffreys v. City of New York,*
    426 F.3d 549, 553 (2d Cir.2005)……………………………………..   4,5

*Jocks v. Tavernier,*
    316 F.3d 128, 136 (2d Cir. 2003)……………………………………..   14

*Kerman v. City of New York,*
    374 F.3d 93, 108 (2d Cir.2004)………………………………………   5,6

*Knight v. U.S. Fire Ins. Co.,*
    804 F.2d 9, 12 (2d Cir.1986)………………………………………   4

*Krause v. Bennett,*
    887 F.2d 363, 371-72 (2d Cir.1989)………………………………   11

*Lennon v. Miller,*
    66 F.3d 416, 425 (2d Cir. 1995)………………………………………   15

*Lipton v. The Nature Company,*
    71 F.3d 464, 469 (2d Cir.1995)………………………………………   4

*Lowth v. Town of Cheektowaga,*
    82 F.3d 563, 569 (2d Cir. 1996)………………………………………   8

*Nat'l Ass'n of Pharm. Mfrs. V. Ayerst Lab.,*
    850 F.2d 904, 909 n. 2 (2d Cir. 1988)………………………………   3

*Robison v. Via,*
    821 F.2d 913, 921 (2d Cir. 1987)……………………………………   7

*Sadallah v. City of Utica,*
    383 F.3d 34, 40 (2d Cir.2004)………………………………………   17

*Savino v. The City of New York,*
    331 F.3d 63,72 (2d Cir. 2003)………………………………………   15
*Soichet .v Toracinta,*
    111 F.3d 124 (2d Cir. 1997)………………………………………   7

*Sologub v. City of New York,*
    202 F.3d 175, 178 (2d Cir.2000)………………………………………   4

*United States v. Alexander,*
    907 F.2d 269 (2d Cir 1990)………………………………………   7,8

*Weyant v. Okst,*
    101 F.3d 845 (2d Cir. 1996)……………………………………..    13

*Ying Jing Gan v. City of New York,*
    996 F.2d 522, 532 (2d Cir.1993)………………………………    4

*Zanghi v. Old Brookville,*
    752 F.2d 42 (2d Cir.1985)……………………………………….    8

*Barratt v. Joie,*
    No. 96 Civ. 0324, 2002 WL 335014, at *9 (S.D.N.Y. 2002)…….    15

*Bradley v. Village of Greenwood Lake,*
    376 F.Supp.2d 528 (S.D.N.Y. 2005)…………………………………    11

*Brogdon v. City of New Rochelle,*
    200 F.Supp.2d 411, 423 (S.D.N.Y. 2002)………………………    14

*Caldarola v. DeCiuceis,*
    142 F.Supp.2d 444, 452 (S.D.N.Y. 2001)………………………    14

*Dukes v. City of New York,*
    879 F.Supp. 335, 341 (S.D.N.Y. 1995)…………………………    8

*Fernandez v. DeLeno,*
    71 F.Supp.2d 224, 229 (S.D.N.Y. 1999)………………………    7

*Hickey,*
    2004 WL 2724079, at *6 …………………………………………    14

*Mayer v. The City of New Rochelle,*
    2003 WL 21222515 (S.D.N.Y. 2003)…………………………………    15

*McLaurin v. New Rochelle Police Officers,*
    373 F.Supp.2d 385 (S.D.N.Y. 2005)…………………………………    4

*Qader v. The People of the State of New York,*
    396 F.Supp2d 466 (S.D.N.Y. 2005)…………………………………    15

*Sulkowska v. City of New York,*
    129 F.Supp.2d 274, 292 (S.D.N.Y. 2001)………………………    15

iv

*Thomas v. Culberg,*
   741 F.Supp. 77, 80 (S.D.N.Y.1990) ………………………………    **10**


*Broughton v. State,*
   37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)……………    **12**

*Colon v. City of New York,*
   60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983)……    **3**

*Holmes,*
   81 N.Y.2d at 1058………………………………………………    **9**

*Howell v. New York Post Co.,*
   596 N.Y.S.2d 293, 303 (1993)…………………………………..    **17**

*People v. Hicks,*
   68 N.Y.2d 234, 508 N.Y.S.2d 163, 500 N.E.2d 861 (1986)……    **7**

*Sindle v. New York City Tr. Auth.,*
   33 N.Y.2d 293, 296-297,
   352 N.Y.S.2d 183, 307 N.E.2d 245……………………………    **14**

*People v. Atkins*
   273 A.D.2d 12 (1st dept. 2000)…………………………………    **9**

*People v. Pines*
   A.D.2d 12 (1st Dept. 2000)…………………………………..    **9**

*Brown v. State of New York,*
   250 A.D.2d 796, 675 N.Y.S.2d 611)…………………………………    **14**

*Evon v. Andrews,*
   211 Conn. 501, 559 A.2d 1131 (1989) …………………………..    **17**

*Gordon v. Bridgeport Housing Authority,*
   208 Conn. 161, 167-68, 544 A.2d 1185 (1988)………………………..    **16**

*Williams v. City of New Haven,*
   243 Conn. 763, 766-67, 707 A.2d 1251 (1998)………………………    **16**

*Pagan v. Anderson,*
   No. 388804, 1991 WL 169530, at *2 (Conn.Super. Aug. 22, 1991)….    **17**

*Daniels v. United States,*
   393 F.2d 359, 361 (D.C.Cir.1968)……………………………………….    10


*State v. Cubano,*
   **9 Conn.App. 548, 553-54, 520 A.2d 250 (1987)……………………..    10**

*State v. DeJesus,*
   **7 Conn.App. 309, (1986)………………………………………    9**

*State v. Piskorski,*
   **77 Conn. 677, 743, 419 A.2d 866, cert. denied,**
   **444 U.S. 935, 100 S.Ct. 283, 62    L.Ed.2d 194 (1979)…………..    10**
State v. Sims
   **12 Conn.APP. 239 (1987)………………………………………    9**

*State v. Tate,*
   **9 Conn.App. 141, 146, 516 A.2d 1375 (1986)…………………………    10**

## PRELIMINARY STATEMENT

Reduced to its essence, this case is about a Plaintiff who fit the description of one of three people who attempted to rob a Chinese delivery man, who was positively identified at the scene by the victim and was arrested as a result. On the night in question, two police officers on patrol that day, Officer Clarke and Hughes received the description of the alleged attackers over the radio and the Plaintiff fit one of the descriptions and was in the general area of the alleged mugging. When they exited their vehicles and approached, the Plaintiff began to run. Plaintiff stated that he had an ipod on so he could not hear if the officers said anything as they approached (See Exhibit A - 50-H Transcript p.17 lns. 17-20) *(So Plaintiff cannot state truthfully that the officers did not identify themselves)*. The Officers gave chase and tackled and threw the Plaintiff to the floor to apprehend him. During their apprehension of the Plaintiff, Plaintiff injured his wrist and was hit on the head. Plaintiff did not seek any medical treatment after the incident (See 50-H Transcript p. 47 ln 25 p. 48 lns. 2-9). This was the only physical contact the officers made with the Plaintiff. The next day February 24, 2007 the Plaintiff was out of Mount Vernon police department custody and control and taken to Valhalla Jail. Based on the foregoing the officers had probable cause to arrest the Plaintiff and detain him – the Plaintiff fit the description, ran as officers approached and was positively identified by the putative victim. Thus, there is no plausible action for false arrest or false imprisonment. The alleged force was reasonable given the circumstances and was incident to the officers' chase of Plaintiff and need to forcibly detain him as a result of his flight. This is not a case of excessive force where the officers beat the Plaintiff for no reason. Even Plaintiff stated that he does not know whether he

1

was punched or something else, just that he was hit on the head (See 50-H Transcript at p18 lns5-13; p. 49 lns1-25 p. 50 lns. 2-4). Thus, there is no plausible action for excessive force, assault or battery. Since probable cause existed and given that Plaintiff has not and cannot prove actual malice on the part of the police department there is no cause of action for malicious prosecution. Further, the actions of the police officers herein - does not shock the conscience - and for this reason Plaintiff's due process rights were not violated. As a result of the foregoing, the Defendants are entitled to judgment on the pleadings and/or summary judgment.[1] Additionally, the police officers are entitled to qualified immunity.

## POINT I

## THE LEGAL STANDARDS

**A.   The Instant Motion**

A complaint is deemed to include any written instrument attached to it as an exhibit, see Fed.R.Civ.10(c); *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir. 1985), materials incorporated in it by reference, see *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), and documents that, although not incorporated by reference, are "integral" to the complaint, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); see *Cortec Indus.*, 949 F.2d at 47.   Defendants submit, at this early stage of the litigation, that the Defendants are entitled to judgment on the pleadings pursuant to 12(c). It is our contention that based upon the aforementioned law, the Plaintiff's 50-h testimony is part

---

[1] The Plaintiff fails to allege how the City of Mount Vernon is liable in the instant matter, however even if Plaintiff had alleged a theory based upon the City having a policy or custom that causes a violation of Plaintiffs rights or a failure to train or conscious indifference, such would fail in any event due to the fact that Plaintiff's constitutional and state law rights were not violated by the police officers.

2

of the pleadings although not referred to in the Plaintiff's complaint it is integral to the complaint and represents the Plaintiffs statements and averments. However, should this Honorable Court rule differently, then Defendants are amenable to conversion of this motion to a motion for summary judgment pursuant to Rule 56 and nonetheless submit that the Officers are entitled to summary judgment at this early stage and reserve the right to provide affidavits and the police report upon the motions conversion. [2] Further, the Defendants submit that the Plaintiff's testimony still represents only the Plaintiff's version of the facts and not the individual officers in line with the "spirit" of qualified immunity which the Defendants also seek in the instant motion.

## B.    Motion Pursuant to Fed. R. 12(c)

A motion to dismiss plaintiff's complaint must accept all facts alleged by plaintiff. The standard of review on a motion for judgment on the pleadings under Rule 12(c) is whether the moving party is entitled to judgment as a matter of law" *Burns Int'l Sec. Serv., Inc. v. Int'l; Union, United Plant Guard Workers of Am.,* 47 F.3d 14, 16 (2d Cir. 1995). This standard is the same as that applicable to a motion to dismiss for failure to state a claim pursuant to 12(b)(6). *Nat'l Ass'n of Pharm. Mfrs. V. Ayerst Lab.,* 850 F.2d 904, 909 n. 2 (2d Cir. 1988).

---

[2] From a procedural perspective, as this Honorable Court is aware, municipalities have the benefit of being allowed - pursuant to the General Municipal Law - to conduct 50-H hearings (essentially an EBT) of the Plaintiff prior to suit. The testimony adduced by municipalities at this stage - where the matter has not "actually commenced" - provides for a very interesting situation when confronted with making a motion on the pleadings pursuant to 12(c), especially where - as here - qualified immunity is being asserted. In these situations, the Complaint does not represent the "only" source of Plaintiff's allegations as to what transpired; the 50-H testimony also represents the allegations made by the Plaintiff.

**C.    Motion Pursuant to Fed. R. 56**

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir.2000). The moving party bears the burden of showing that no genuine factual dispute exists. *Carlton -v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir.2000) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir.1994)). "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir.2005)(quotation marks omitted). When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and present such evidence as would allow a jury to find in his favor, *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a Summary Judgment Motion." *Lipton v. The Nature Company*, 71 F.3d 464, 469 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); see also *Ying Jing Gan v. City of New York*, 996 F.2d

4

522,532 (2d Cir.1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the Summary Judgment Motion are not credible). Moreover, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Jeffreys*, 426 F.3d at 554.

## D.    Qualified Immunity

"As a general rule, police officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their actions did not violate those rights." *Kerman v. City of New York,* 374 F.3d 93, 108 (2d Cir.2004)( "Kerman II" ). The matter of whether a right was clearly established is a question of law, while the matter of whether a defendant's conduct was objectively reasonable is a mixed question of law and fact. Id . In *Cowan v. Breen,* the Second Circuit explained the process for evaluating claims of qualified immunity in excessive force claims under the analysis laid out by the Supreme Court in *Saucier v. Katz,* 533 U.S. 194, 201-02, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) and preceding cases:

The threshold question is whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation. The inquiry is whether the alleged use of excessive force was objectively reasonable. Thus, claims that an officer made a reasonable mistake of fact that justified the use of force are considered at this stage of the analysis. If the plaintiff fails to establish a constitutional violation, the qualified immunity inquiry ends and the plaintiff may not recover. If, however, a constitutional violation can be shown, the

*5*

court must then determine whether the constitutional right was clearly established at the time of the constitutional violation. This inquiry focuses on whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted....This inquiry adds a 'further dimension' to the qualified immunity analysis by acknowledging that reasonable mistakes can be made as to the legal constraints on particular police conduct.... And it ensures that all but the plainly incompetent or those who knowingly violate the law are protected from suit. *Cowan vs. Breen*, 352 F.3d 756, 761 (2d Cir.2003) (citations omitted). Under this standard, summary judgment may be appropriate even when a material fact issue exists on an excessive force claim if the "law did not put the officer on notice that his conduct would be clearly unlawful." *Saucier*, 533 U.S. at 202. However, summary judgment is not appropriate where material issues of fact exist with regard to both the underlying constitutional violation and the availability of the immunity defense. See *Kerman II*, 374 F.3d at 109 ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, ... if there is such a dispute, the factual questions must be resolved by the fact finder."); *Cowan*, 352 F.3d at 764 (denying summary judgment because "genuine, material, factual disputes overlap both the excessive force and qualified immunity issues."); *Kerman v. City of New York*, 261 F.3d 229, 240 (2001)( "Kerman I" )(finding summary judgment on qualified immunity grounds is not appropriate where the parties' versions of the facts differ markedly and the facts in dispute are material to a determination of reasonableness). The same qualified immunity analysis is

performed by courts in cases involving unreasonable search and seizure claims under the Fourth Amendment. See, e.g., *Caldarola v. Calabrese*, 298 F.3d 156, 161 (2d Cir.2002).

In *Robison v. Via*, 821 F.2d 913, 921 (2nd Cir. 1987), the Court of Appeals for the Second Circuit held that an officer is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences show either (a) that it was objectively reasonable for the officer to believe that probable cause existed or (b) that officers of reasonable competence could disagree on whether there was probable cause or reasonable suspicion under *Terry v. Ohio* . *Robison* at 921.

Qualified immunity applies to both state law and section 1983 claims. *Calamia v. City of New York*, 879 F.2d 1025, 1035-36 (2d Cir. 1989).

The Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation. See *Saucier Katz*, *Hunter v. Bryant* 502 U.S. 224, 112 S.Ct.534, 60 USLW 3430, 116 L.Ed.2d 589, 60 USLW 3432 (19991); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984); *Mitchell*, supra, 472 U.S., at 526, 105 S.Ct., at 2815; *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Anderson*, supra, 483 U.S., at 646, n. 6, 107 S.Ct., at 3042, n. 6.

## POINT II

## THE DEFENDANTS HAD PROBABLE CAUSE TO ARREST THE PLAINTIFF

The validity of an arrest does not depend upon an ultimate finding of guilt. *Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967); *Fernandez v. DeLeno*,

7

71 F.Supp.2d 224, 229 (S.D.N.Y. 1999). The soundness of an arrest hinges on the existence of probable cause at the time of the arrest and immediately before it. *Lowth v. Town of Cheektowaga,* 82 F.3d 563 (2d Cir. 1996); *Zanghi v. Old Brookville,* 752 F.2d 42, 45 (2d Cir.1985). Probable or reasonable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information. *Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983). Even if the basis for the arrest dissipated subsequent to the arrest, it does not eliminate the probable cause that existed at the time of the arrest. *Dukes v. City of New York,* 879 F.Supp. 335, 341 (S.D.N.Y. 1995).

### a.    *The plaintiffs fitting the description of one of the alleged attackers coupled with his flight gave probable cause*

In the case at bar the officers had probable cause based upon the following. The fact that the Plaintiff fit the description of at least one of the alleged attackers. In the Complaint the Plaintiff acknowledges that identification of the Plaintiff as the suspect was made on the basis of the clothes he was wearing and the color of his skin (See Complaint at P23). How else are identifications made if not based upon clothing and race identity? Certainly, not saying that this guarantees that someone is the right person, but certainly it is objectively reasonable for the officers to make an identification of a perpetuator of an alleged crime initially by whether he fits a description. Such identification by clothing and race does not violate a person's constitutional rights. Further, when the officers exited their vehicles to question the Plaintiff, the Plaintiff ran (See Complaint at p 8). Plaintiff's flight coupled with the officer's reasonable opinion that Plaintiff fit the description -

provided reasonable grounds for the officers to pursue the Plaintiff and gave them probable cause. Indeed, "flight combined with other specific circumstances indicating that the suspect is engaged in criminal activity could provide the predicate necessary to justify pursuit." *Holmes*, 81 N.Y.2d at 1058. Thus, while flight has no independent significance as a predicate for police action, it is an elevating factor. See *Kamins*, supra, at 143-44. A founded suspicion of criminality, coupled with the suspect's flight can give rise to reasonable suspicion. *Holmes*, 81 N.Y.2d at 1058; see, e.g., *People v. Pines*, __ A.D.2d __, 722 N.Y.S.2d 239 (1st Dept. 2000); *People v. Atkins*, 273 A.D.2d 12 (1st Dept. 2000).

### b. *On the scene show up, where the putative victim identified the Plaintiff as one of his attackers, provided probable cause*

The case for probable cause goes even further where here there was an on the scene show up, in that the victim was brought to the scene of where the Plaintiff was and he then positively identified the Plaintiff as one of his attackers (See Complaint at P22 &24)(See also Exhibit A at p24 lns 23-25 p25 lns 2-13 p26 lns 17-25 p27 lns2-5). Prompt on-the-scene confrontations tend under some circumstances to ensure accurate identifications and ... the benefits of promptness not only aid reliability but permit a quick release of an innocent party if there is no positive identification, allowing the police to resume the investigation with only a minimum of delay." *State v. DeJesus*, 7 Conn.App. 309, 315-16, 508 A.2d 463 (1986); *State v. Sims*, 12 Conn.App. 239, 242, 530 A.2d 1069 (1987), cert. denied, 206 Conn. 801, 535 A.2d 1315 (1988). Here, the show-up procedure was held at almost the same time the officers had chased and secured the Plaintiff in the general area where the alleged mugging occurred. The promptness of the show-up in this case further augments

9

the officers' probable cause to arrest the Plaintiff. In these reasonable officer's minds and pursuant to the law, the prompt-show-up aided in the reliability and would have made possible the immediate release of the Plaintiff if the victim had not identified him, thus minimizing the limitation on the Plaintiff's liberty. It follows that the officers and the City for that matter should not be held to have violated the Plaintiff's constitutional and state law rights in this instance. Given the totality of the circumstances the officers acted reasonably. Even further, Plaintiff's averment that the victim was across the street when he identified the Plaintiff is of no consequence as "a view of even a few seconds may be sufficient for a witness to make identification. *State v. Piskorski,* 177 Conn. 677, 743, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S.Ct. 283, 62 L.Ed.2d 194 (1979). This court has held similarly. *State v. Cubano,* 9 Conn.App. 548, 553-54, 520 A.2d 250 (1987); *State v. Tate,* 9 Conn.App. 141, 146, 516 A.2d 1375 (1986).

Further, given the foregoing and the law in this District "officers have probable cause to arrest if they receive 'information from some person-normally the putative victim or eyewitness-who it seems reasonable to believe is telling the truth," ' *Thomas v. Culberg,* 741 F.Supp. 77, 80 (S.D.N.Y.1990) (quoting *Daniels v. United States,* 393 F.2d 359, 361 (D.C.Cir.1968)).

c.    *Officer's failure to explore Plaintiff's alibi does not negate a finding of probable cause and does not amount to a violation of the Plaintiff's rights*

Plaintiff's averment that the officers had an obligation to research and look into his alibi, is not legally relevant nor does it negate a finding here that the officers had probable cause to arrest the Plaintiff. "It is immaterial that a more thorough investigation by [an

10

officer] might have revealed that [a plaintiff] really did [have a justification for his conduct that would have negated probable cause]....A contrary holding would put an unfair burden on law enforcement officers. It would be unreasonable and impractical to require that every innocent explanation for activity that suggests criminal behavior be proved wrong, or even contradicted, before an arrest warrant could be issued with impunity....It is up to the fact-finder to determine whether a defendant's story holds water, not the arresting officer. Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury". *Krause v. Bennett,* 887 F.2d 363, 371-72 (2d Cir.1989). See also *Curley v. Village of Suffern,* 268 F.3d 65, 70 (2d Cir.2001) ("Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him. Nor does it matter that an investigation might have cast doubt upon the basis for the arrest. Before making an arrest, if the arresting officer has probable cause, he need not also believe with certainty that the arrestee will be successfully prosecuted.").

## POINT III

## ARGUABLE PROBABLE CAUSE WILL SUFFICE TO CONFER QUALIFIED IMMUNITY FOR FALSE ARREST CLAIMS UNDER BOTH STATE AN FEDERAL LAW

The existence of probable cause or arguable probable cause gives government Officials an absolute immunity defense to such claims and affords the arresting officers qualified immunity from litigation. *Bradley v. Village of Greenwood Lake* 376 F.Supp.2d 528 (S.D.N.Y. 2005) *citing Caldarola v. Calabrese,* 298 F.3d 156 (2d. Cir. 2002).

Because probable cause to arrest constitutes justification, there can be no claim for

11

false arrest where the arresting officer had probable cause to arrest the Plaintiff. *Escalera v. Lunn* 361 F.3d 737 (2nd Cir. 2004).  Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.  *Id* ***Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a 1983 suit for damages if he can establish that there was arguable probable cause to arrest; "arguable probable cause" exists if either it was objectively reasonable for the officer to believe that probable cause existed, or officers of reasonable competence could disagree on whether the probable cause test was met (emphasis added). 42 U.S.C.A. §1983.***

In §1983 action false arrest, if there remains an objective basis to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted the Defendants on the basis of qualified immunity.

To establish a claim for false arrest plaintiff must show that his confinement was not otherwise privileged. *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310 (1975).   If officers had probable cause, the confinement is privileged. Whether the probable cause standard has been met in a particular case is determined by reference to the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).

Probable cause exists where the officer has "knowledge or reasonably trustworthy

12

information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. *Weyant v. Okst*, 101 F.3d 845, 852 (2nd Cir. 1996).

As this Honorable Court can see from the argument above in Point II, the officers had probable cause to arrest the Plaintiff and for this reason are entitled to qualified immunity.

**POINT IV**

**THE OFFICERS DID NOT USE EXCESSIVE FORCE WHEN ARRESTING THE PLAINTIFF – INDEED THE FORCE USED WAS REASONABLE GIVEN THE CIRCUMSTANCE**

In analyzing a claim of excessive force[3], allowance must be made for the fact that "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers... violates the Fourth Amendment." Id.  Further, Plaintiff indicated that he had an ipod in his ears so that he could not hear what the officers were saying if anything so their verbal command to stop or indicating that they were police indicates that he would not have heeded those warnings and here the Officers force admittedly stopped once they stood the Plaintiff up with the handcuffs.  Given these circumstances, the non-deadly force used by the officers in apprehending a fleeing suspect was reasonable as a matter of law ( see, General Business

---

[3] While Plaintiff's complaint does not allege a specific claim for excessive force, Plaintiffs reference to a scraped wrist and a hit on the head when he was being apprehended could implicitly be arguing excessive force, thus Defendants have addressed why this does not amount to excessive force.

13

Law § 218; cf., Penal Law § 35.30[4]; see, *Sindle v. New York City Tr. Auth.*, 33 N.Y.2d 293,

296-297, 352 N.Y.S.2d 183, 307 N.E.2d 245; cf., e.g., *Brown v. State of New York*, 250 A.D.2d

796, 675 N.Y.S.2d 611).

## POINT V

## PLAINTIFF'S MALICIOUS PROSECUTION CLAIM MUST FAIL

In New York 1983-based malicious prosecution claims, like false arrest claims, are"

distinguished from their state law analogues only by the requirement that the tortfeasor act

"under color of state law" *Hickey*, 2004 WL 2724079, at *6. Accordingly Courts look to the

New York State law of malicious prosecution, which requires a plaintiff prove: "(1) the

initiation of continuation of a criminal proceeding against the plaintiff; (2) termination of

the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the

proceeding; and (4) actual malice as a motivation for the defendants actions." *Jocks v.*

*Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003)(internal quotations omitted). "There must be 'a

showing of some deliberate act punctuated with awareness of "conscious falsity" to

establish malice." *Brogdon v. City of New Rochelle*, 200 F.Supp2d 411, 423 (S.D.N.Y. 2005)

(quoting *Caldarola v. DeCiuceis*, 142 F.Supp.2d 444, 452 (S.D.N.Y. 2001).

Based upon the following Plaintiff's malicious prosecution claim must fail. Plaintiff

has not and can not allege or prove that the officers had actual malice. Further, the

Officers are entitled to qualified immunity on the malicious prosecution claim because the

belief that probable cause to charge the Plaintiff existed was objectively reasonable. "In

assessing whether the officers were objectively reasonable in their belief that they had

probable cause to charge the plaintiff with a violation of the offense, we apply the same

14

standard that we used to evaluate qualified immunity in the false arrest context. That is, was it objectively reasonable for the officers to believe that probable cause existed or could officers of reasonable competence disagree on whether the probable cause test was met?" *Mayer v. The City of New Rochelle*, 2003 WL 21222515 (S.D.N.Y. 2003) citing *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995); see also *Bonide Products, Inc. v. Cahill*, 223 F.3d 141, 145-46 (2d Cir. 2000).

Further, probable cause is a complete defense to a claim of malicious prosecution. *Qader v. The People of the State of New York*, 396 F.Supp2d 466 (S.D.N.Y. 2005) citing *Savino v. The City of New York,* 331 F.3d 63,72 (2d Cir. 2003).

## POINT VI

## PLAINTIFF'S DUE PROCESS CLAIMS MUST FAIL

Plaintiff alleges a deprivation of his due process rights under the Fourteenth amendment. Under the Fourteenth Amendment, pretrial detainees may not be subjected to conditions that constitute punishment, or government conduct that "shocks the conscience". The Plaintiff asserts that he was handcuffed and held at the police station for several hours, that he had an injury to his wrist which occurred when he was thrown to the floor, that he was deprived of his right to familial association. Viewing the facts most favorable to the Plaintiff his treatment does not rise to the level of a due process violation. See *Barratt v. Joie*, No. 96 Civ. 0324, 2002 WL 335014, at *9 (S.D.N.Y. May 4, 2002) (no due process violation where plaintiff was handcuffed for five hours in a holding cell); *Sulkowska v. City of New York*, 129 F.Supp.2d 274, 292 (S.D.N.Y. 2001)("Plaintiff's restraint by handcuffs was merely an incident of her detention and does not amount to the type of

15

punishment that violates the Fourteenth Amendment."). Further, Plaintiffs injury to his wrist was as a result of the officers having to run after the Plaintiff and forcibly restrain him as a result of his flight. Even the hit on the head Plaintiff can not testify to whether this was intentionally done or as a result of the officers trying to restrain the Plaintiff. Plaintiff does not allege any other shocking conduct on the part of the Police Officers after they arrested him and brought him into the station. Plaintiff's facts about being harassed about gang activity, taken of extensive pictures of his body tattoos, and physical exam were all done at the correctional facility in Valhalla beyond the purview of the Mount Vernon police department (See Complaint ¶s 25, 26, 27, 28, 29, 30 and 31).

## POINT VII

## PLAINTIFF'S STATE LAW CLAIMS SHOULD FAIL

Plaintiff's common-law tort claims for negligence, intentional infliction of emotional distress, assault and battery should all be dismissed. Some of these claims are barred by the doctrine of governmental immunity. It is well-settled that a municipality cannot be sued directly for common-law negligence. *Williams v. City of New Haven*, 243 Conn. 763, 766-67, 707 A.2d 1251 (1998). Likewise, plaintiffs' claims against the individual officers in their official capacities must fail since any claim against them in their official capacities is tantamount to a claim against the City itself. With respect to plaintiffs' claims against the individual defendants in their individual capacities, municipal employees are immune from liability for the performance of governmental acts, as distinguished from ministerial acts. All actions of the defendants that are challenged in this case were governmental acts, see *Gordon v. Bridgeport Housing Authority*, 208 Conn. 161, 167-68, 544 A.2d 1185 (1988), and,

16

therefore, the officers are entitled to governmental immunity as to those acts. The operation of a police department has been held to be a government function, id.. See *Pagan v. Anderson,* No. 388804, 1991 WL 169530, at *2 (Conn.Super. Aug. 22, 1991). An exception to the rule that a public officer is immune from civil liability for discretionary acts is when it would be apparent to the officer that a failure to act would likely subject an identifiable person to imminent harm. See *Evon v. Andrews,* 211 Conn. 501, 559 A.2d 1131 (1989). Here, however, there is no evidence that the actions or inactions of these officers were likely to subject Plaintiff to imminent harm. We find that the "identifiable-imminent harm" exception to the general rule of governmental immunity does not apply here. Further, to recover for intentional infliction of emotional distress New York law requires that the defendants conduct be extreme and outrageous, such that it exceeds the bounds of decency. *Howell v. New York Post Co.,* 596 N.Y.S.2d 293, 303 (1993). No such claim can be made even taken the facts most favorable to the Plaintiff. Therefore, all defendants' are entitled to a dismissal of the Plaintiff's state law and prima facie tort claims.

Additionally because the federal claims against the Defendants must be dismissed the Defendants assert that there should be a dismissal of the supplemental state law claims for false arrest, false imprisonment and malicious prosecution, pursuant to 28 U.S.C. 1367(C)(3) *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Further, a district court can decline to exercise supplemental jurisdiction over state law claims when it has dismissed all of the claims over which it has original jurisdiction. See *Sadallah v. City of Utica,* 383 F.3d 34, 40 (2d Cir.2004) (citations omitted). Thus, as

17

demonstrated above, if this Honorable Court sees fit to dismiss all of Plaintiff's federal claims, which, if viable, would provide a basis for federal jurisdiction, we respectfully request that the Court decline to exercise jurisdiction over the state law claims.

18

## CONCLUSION

In sum, the police officers had probable cause to arrest the Plaintiff and for this reason they did not violate the Plaintiff's rights. Even if they did not have probable cause they had arguable probable cause and are entitled to qualified immunity with regard to all of the Plaintiff's causes of action. All of Plaintiff's state law claims should be dismissed as all of his federal claims should be dismissed. The actions of the police officers on the day in question were objectively reasonable. Plaintiff fails to allege any viable claims against the City of Mount Vernon and even had Plaintiff alleged state and constitutional claims against the City of Mount Vernon, such would not be viable given the fact that the police officers did not violate the Plaintiff's constitutional or state law rights. Thus, all Defendants, the City of Mount Vernon, the Mount Vernon Police Department and Individuals of the City of Mount Vernon Police Department are entitled to judgment on the pleadings, qualified immunity - where applicable - and alternatively, summary judgment, and all causes of action should be dismissed as to all of them.

RESPECTFULLY SUBMITTED,

HELEN M. BLACKWOOD, ESQ.
CORPORATION COUNSEL

By: _____
Nichelle A. Johnson (NAJ 7688)
City Hall
1 Roosevelt Square
Mount Vernon, New York 10550
(914) 665-2366
Attorneys for Defendants

19

# EXHIBIT A

```
1                          J. GARCIA              15

2       middle doors or the front door?

3              A.     The back door.

4              Q.     So, when you exited the bus at

5       the back door you began to walk?

6              A.     Yes.

7              Q.     You did you walk east, west,

8       north or south on Lincoln, if you recall?

9              A.     The bus stop itself is on

10      Columbus.  And on the corner of the Columbus

11      and Lincoln.

12             Q.     Okay.

13             A.     I walked across Columbus onto

14      Lincoln.  I started to walk down Lincoln

15      going towards Pelham area.

16             Q.     Was this a regular stop that

17      you would get off at on this bus to go home?

18             A.     Yes.

19             Q.     Then you realized there was a

20      car following you as you walked?

21             A.     They didn't follow me.  They

22      were coming this way and I was on this side

23      of the street.  (Indicating.)

24                    They were coming like oncoming

25      traffic.  They pulled up aside of me and I
```

```
 1                              J. GARCIA            16
 2        noticed them and I just kept walking.  Then
 3        two guys jumped out of the car.
 4              Q.    Can you describe those two guys
 5        that jumped out of the car?
 6              A.    One was a black male.  He had
 7        on a football jersey.  The other one was I
 8        believe a white male.  And he had on - I am
 9        not sure what he had on.
10              Q.    When you saw the car, what if
11        anything did you think about the car?
12              A.    Regular car.  Average car.  It
13        was a Lincoln town car.  It could have been
14        a cab.  It could have been somebodies
15        personal car.  It was a black Lincoln town
16        car.  Tinted windows.
17              Q.    You indicated that you saw a
18        black car that had tinted windows.
19              A.    Yes.
20              Q.    On all four windows or two
21        windows?
22              A.    I am not sure.  It was late.
23              Q.    But you believe it was a black
24        car with tinted windows?
25              A.    Yes.
```

```
1                        J. GARCIA              17
2            Q.    Initially, I believe you
3       indicated that you just kept walking?
4            A.    Yes.
5            Q.    Then the two individuals exited
6       the vehicle?
7            A.    Yes.
8            Q.    And then what happened?
9            A.    They started to the run towards
10      me.
11           Q.    How far away from them were you
12      at that point?
13           A.    Not far.  They pulled right up
14      beside side me.  They got out of the car and
15      immediately started to run toward me.  So, I
16      began to run.
17           Q.    Did they say anything to you?
18           A.    I am not sure.  I had an iPod.
19      I was listening to the iPod while I was
20      walking home.
21           Q.    What kind of iPod did you have?
22           A.    A blue iPod nano.
23           Q.    Okay.  Are you saying that the
24      two individuals began to run at you?
25           A.    Yes.  Towards me.
```

```
1                         J. GARCIA                    18

2              Q.     And you began running?

3              A.     Yes.

4              Q.     What happened next?

5              A.     I was running and I slipped on

6        a piece of ice.  So, I lost my balance.  By

7        the time I was getting up, they caught up to

8        me.  And I was thrown to the floor in the

9        middle of the street, from the sidewalk to

10       the street.  I was hit in the back of the

11       head.  I am not sure if I was punched but I

12       was face down on the floor.  Then they put

13       handcuffs on me.

14             Q.     At the time that you were

15       thrown to the floor, did you still have your

16       iPod nano in your ears?

17             A.     No.  They fell out and got

18       damaged.

19             Q.     What if anything did these

20       individuals say to you at that time as you

21       were being thrown to the floor?

22             A.     They weren't saying anything.

23       They were putting handcuffs on me.  They

24       stood me up and one of the officers I guess

25       radioed to another cop.  That's when I
```

1                          J. GARCIA                    19

2        realized they were police when I was

3        handcuffed.

4              Q.    Then what happened?

5              A.    They radioed in and I asked

6        them what was going on.  And another cop car

7        pulled up in front of the marked cop car.

8        An officer got out.  He looked at me and

9        said, yes, that's him.  I asked him what was

10       going on and he told me to be quiet.

11             Q.    Let me stop you there for one

12       moment.  You just said that a marked cop car

13       came.

14             A.    Yes.

15             Q.    What do you mean by that?

16             A.    Like an actual police car with

17       the lights and sirens pulled up in front of

18       us where we were located.

19             Q.    That was a different car than

20       the one you had seen?

21             A.    Yes.

22             Q.    Why?  Because the black car -

23             A.    Was just a black car.  Right.

24       It had no police anything on it.

25             Q.    Where have you heard the word

J. GARCIA                25

1
2    blocking off the street.
3              Then one of the undercover cops
4    knocked on the front window, passenger
5    window of that police car, he rolled down
6    his window.  They were saying something.
7    The police car in the passenger's side
8    looked back and was saying something to
9    somebody in the back seat of the cop car.  I
10   am guessing it was the Chinese man who said
11   I committed a crime against him.  I don't
12   know what was said after that.  I was on the
13   opposite side of the street.
14             Q.    You indicated the undercover
15   cop knocked on the passenger's side of the -
16   at this time the third police car that
17   showed up.
18             A.    Yes.
19             Q.    When you say undercover cops,
20   who are you talking about?
21             A.    They were not in uniform.  They
22   were the two that got out of the vehicle
23   that looked like an average vehicle.
24             Q.    When you say undercover cops,
25   you mean the original two guys that got out

```
 1                          J. GARCIA                26
 2        of the black tinted window car?
 3              A.    Yes.
 4              Q.    Did you see the Chinese man
 5        inside the third police car?
 6              A.    No.
 7              Q.    That third police car, I think
 8        you indicated was probably a marked cop car
 9        according to your definition.
10              A.    Yes.
11              Q.    How then are you coming to the
12        conclusion that you assume that it was the
13        Chinese guy in the back who was telling them
14        that you committed the crime?  How did you
15        know there was a Chinese guy back there?
16        When did you find that out?
17              A.    When I was taken in, after that
18        happened, the two undercover cops took me to
19        the car that they were in.  I sat in the
20        back seat.  The black officer sat with me in
21        the back seat.  The other officer was
22        driving.  He was telling me what was going
23        on.  That they were called and I matched the
24        description of what was given by a Chinese
25        man who was delivering food in my area was
```

  
J. GARCIA                    27

1

2      mugged.

3                   So, I assumed that that was the

4      person who was identifying me as the person

5      who committed the crime.

6            Q.    You indicated that these

7      undercover cops knocked on the passenger's

8      side of the third police car?

9            A.    Yes.

10           Q.    The passenger's side in the

11     front seat?

12           A.    Yes.   There were two cops in

13     that car.   One in the driver's side.   One in

14     the passenger's sides .

15           Q.    What did you see the officers

16     inside the third car do?

17           A.    The undercover officer knocked

18     on the window and the officer in the

19     passenger's seat were talking to each other.

20           Q.    Yes?

21           A.    He looked behind him and asked

22     the guy who was sitting in the back seat.

23           Q.    Okay?

24           A.    I don't know what they were

25     saying.

J. GARCIA                 47

1

2    that same week or a month later?

3              A.    Maybe a month or two later.

4              Q.    Did you go to court with your

5    same attorney?

6              A.    Yes.

7              Q.    What if anything happened then?

8              A.    When I got to court, I waited

9    until my name was called and the judge said

10   that they were dropping the charge because

11   of insignificant evidence.  And my lawyer

12   told me that when they later asked the same

13   gentleman who picked me out from the lineup,

14   that he didn't pick the same person twice.

15   It was basically what I was wearing.  It was

16   the clothing.

17             Q.    I believe you indicated that

18   your attorney told you that apparently the

19   man who said you mugged him, that he did not

20   pick the same person twice?

21             A.    I think they did like a lining

22   or a picture shot, like mug shots I guess.

23   And his story was not the same.  His story

24   changed.

25             Q.    Did you seek any medical

```
1                              J. GARCIA              48
2        attention as a result of the blow to your
3        head that you received?
4              A.    No.  I don't have health
5        insurance.
6              Q.    How about with regard to your
7        wrist?
8              A.    No.  By the time I got out of
9        Valhalla, it was healed already.
10             Q.    When the officers first ran to
11       you, I believe you indicated that you ran
12       from them.
13             A.    Yes.
14             Q.    And then you slipped on a piece
15       of ice?
16             A.    Yes.
17             Q.    As a result of slipping on the
18       ice, did you fall to the ground?
19             A.    I stumbled and they caught up
20       with me.
21             Q.    But you didn't hit the ground?
22             A.    No.
23             Q.    That's when they threw you to
24       the ground?
25             A.    Yes.  Slammed me to the ground.
```

J.  GARCIA                    49

        Q.    Did you struggle with them,
like fight with them at all?

        A.    No.   They were big men.   There
was not much of a fight.   They tossed me on
the floor.   Slammed me to the street.

        Q.    Okay.   Did they both slam you
to the floor or was it one particular
officer?

        A.    One.   But both were on top of
me while I was on the floor.

        Q.    Which officer slammed you to
the floor?

        A.    I am not sure.   While I was on
the floor, I felt two bodies on me.

        Q.    If you were not struggling,
what were they doing?   Were they grabbing
your arms together?

        A.    Basically, I felt like he was
laying on top of me.   I guess so I wouldn't
move.   And the other one was getting my
arms.   He was probably the one that hit me
in the back of my head.

        Q.    But as you sit here today, I
believe you indicated you don't know how he

J. GARCIA                    50

2  hit you in the head.  Was it a punch or you

3  just felt a blow to the back of your head?

4        A.    Yes.

5        Q.    And the wrist injury that you

6  had, was that as a result of being slammed?

7        A.    Yes.

8        Q.    Your wrist actually made

9  contact with the ground?

10        A.    Yes.

11        Q.    Okay.  How old in years were

12  you at the time when this occurred?

13        A.    19.

14        Q.    In terms of your employment,

15  how many days of work did you miss as a

16  result of this?

17        A.    I missed one day of work and

18  one day of school.  I missed my class on

19  Monday and one day at work.

20        Q.    The day of work that you missed

21  was Saturday?

22        A.    Yes.

23        Q.    And the day of class of Monday?

24        A.    Yes.

25        Q.    What if any damage was done to